Oral argument not to exceed 15 minutes per side. Thank you, Your Honor. I'm accompanied by David Follam. May I reserve two minutes at the conclusion, please? Of course. Thank you, Your Honor. Your Honor, I represent a gentleman in the horse business, sitting with me here today, who was defrauded into purchasing a horse that was materially defected. He purchased the horse to race her. She has never raced and was never capable of racing. This goes back to September of 2012, when John Stephens purchased Selena. At the time he purchased her, he had information that allowed him to determine what her real value was. At the Keeneland sales, there is a repository where there are x-rays and reports and letters. The seller is required to disclose certain information. For instance, if there has been invasive joint surgery, when Stephens bought the horse, there was a letter in the repository that his veterinarian reviewed that said there has been surgery. The veterinarian says he told Mr. Stephens about that. His veterinarian, Mr. Stephens' veterinarian, also made a determination that there is sesamoiditis, that there is an inflammation in an area near the ankle. So Dr. Bonin Clark, a very experienced equine surgeon, whose deposition has been taken and relied upon extensively by us, did not elect to advise Mr. Stephens to do an ultrasound to determine the extent of the sesamoiditis, because, based on what he saw, it was not necessary in order to value this horse for $40,000, which is the purchase price. The horse was then shipped as a one-year-old, and as you all know, racing starts at two for thoroughbreds. She was sent to Mr. Stephens' farm in Florida. Dr. Bonin Clark thereafter ultrasounded this horse three times. The ligament problem that we are alleging was the injury to the bone which prohibited this horse from ever racing was known to Dr. Bonin Clark through three separate ultrasounds. Each of those ultrasounds he had in his company, either Mr. Stephens or his trainer at the farm, Ms. Dawson, he told them that this horse has a problem with her ligament and that you should take it easy on her. Help me understand, though. Isn't there a distinction between the foot on which the surgery was accomplished and the claim for the injury that you say prevents her from running? Yes, Your Honor. Both had to be disclosed. I will address the conditions of sale. That's exactly right. So if they had disclosed that there had been this invasive joint surgery, which all veterinarians agree had occurred and had to be disclosed, then Mr. Byzance would have been known to do more due diligence and he perhaps would have found the injury in the other foot. I'm sorry. I don't recall specifically as I sit here. Was the surgery disclosed prior to the purchase by Mr. Byzance or was it not disclosed? Not disclosed. And you're saying had that surgery been disclosed, then your client would have just engaged in a much more kind of comprehensive due diligence? Yes, Your Honor, and I have extensive proof through depositions that that's the case. The agent who did the purchase has bought hundreds of horses at 2-year-old and sale auctions. He would have asked more questions. The veterinarian they hired to do the due diligence for Mr. Young, who was the agent for Stevens, would have done more due diligence. Is that Dr. Hay? Yes, Your Honor, Scott Hay. Well, didn't he testify that the report was in the repository? Exactly. And that he could have requested it but chose not to? Your Honor, the report was not in the repository. Well, but didn't your vet testify that the report was in the repository? He testified he thought it was. He did not see it. Dr. Chivanis, who actually prepared the report, said it was not in the repository. There is no evidence, and that's one of the problems with the findings of Judge Weir. He's made certain assumptions as to what the evidence is, which is not supported by any testimony or any document. I'm just struggling with having your own veterinarian testify that the report was there. He could have requested it, and he chose not to. He did say that. Is that then an issue between that veterinarian and the owner as opposed to? I'm struggling with the due diligence. You hire somebody, you expect them to look at it, they tell you it was there, I didn't think it needed to be looked at. Why isn't that, if it was available and just not taken, why doesn't that resolve the case against you? Well, Your Honor, there are multiple reasons why we should prevail. One of the reasons is that there was a failure to disclose accurate information about the injury to the suspensory that attaches to the bone. The report does not disclose that. The report only says there is moderate sesamoiditis, which is not consistent with the actual tear. Now, what Dr. Bone and Clark think. I mean, if a modest surgery on the other leg would have triggered this sort of comprehensive diligence, wouldn't the disclosure of this seismoiditis or however you say it, wouldn't that trigger? Well, you know, we better make sure it's not worse than it's. Dr. Chivanis said that the knowledge of the sesamoiditis might be of interest to one or two out of five veterinarians. But Dr. Chivanis did not recommend an ultrasound. Dr. Chivanis did not believe any further inquiry was required. Is this your client's vet we're talking about at this point? Dr. Chivanis was retained by Stevens to do examinations and radiographs of Selena before the sale in April to Mr. Bizantz. We have a material. I apologize. Judge Strach, we have a material disagreement with that. There is no evidence that it was in the repository. I agree. Dr. Hay said, I think it was in there. He did not say, I saw it and chose not to read it. Well, but there's then the fuss about whether it was there to pick up and read or whether you had to request it. But wasn't his testimony that he chose not to request it? His testimony is he would have chosen to not request it. Do not believe he said, I knew it was there and decided I didn't want to look at it. Let me ask you this question. On the face of it, if it was in some other context, somebody thought they were buying a racehorse and got at best a broodmare. But we have a lot of, because Kentucky is in our circuit over the years, a lot of these horse cases and there's sort of a unique body of law that surrounds these cases. The whole conditions of sale and whatnot, the underlying thread seems to be a heavy emphasis on buyer beware. Keeneland doesn't even warrant that the information in the repository is complete and whatnot. These are very sophisticated buyers and sellers and so forth. Other than the fact that the seller said, I really like this horse, how do you get around all of that? I mean, the facts are interesting, but at the bottom line is that these things, they're short time limits and so forth and so on. It's tied up pretty tightly. It is exactly, and that's the contract issue. We have a fraud issue too, Your Honor. That's exactly what the problem is. Mr. Bizantz is a very experienced horse buyer. He knows the conditions of sale. He knows that a seller is obligated to put in the repository and disclose that there has been a previous invasive joint surgery. So he relied upon that being true. That is, the omission means there has been none. He relied upon the fact that the seller is required to disclose any material bone problem which is likely to prevent a horse from being able to train or run. He relied upon the fact that accurate medicine disclosures were given. So as a sophisticated buyer, he assumes that he would have been told and it would have accurately been reported that this horse had these problems. What Dr. Bonin-Clark found specifically when he first did the ultrasound on this horse, she had a grade II lesion of the left hand medial suspensory branch at the attachment site, and the suspensory branch is enlarged with tearing away from the bone. It was moderate to severe. This horse missed over 70 days of training while Mr. Stevens had it due to this problem. It did not get better. He said stabilized, but it actually got worse. The last ultrasound in January of 2013 showed that the tear was actually larger. All of the vets say this is information that is critical to know when managing a horse. So the issue is not were these conditions of sale rational or reasonable. It is that the conditions of sale actually worked to perpetrate the fraud on Mr. Bizantz because he relied on their accuracy. What did he know at the time of purchase? He knew that there was some kind of moderate, how do you say it, seismic? Seismoiditis. Mr. Bizantz did not know that. Okay, what did he know? Mr. Bizantz's agent went to the repository and expected to find information that is necessary to disclose according to the conditions of sale. Notwithstanding the representation there that the repository may not contain all the relevant information. It may not contain all the relevant information, but the conditions of sale say beyond any doubt that you must disclose prior invasive joint surgery. The conditions of sale say beyond any doubt you must disclose any disease or injury to the bone which has a probability of impacting a horse's ability to train and race. This is a two-year-old in training sale. It's not a broodmare sale. It's not a yearling sale. So the conditions are somewhat different. The timing is not rational or reasonable. You've referred to the other cases that have been decided in the United States District Court and in federal court. As you know, Judge Weir said, Kentucky law is what applies. And under Kentucky law in a case in which we were involved, Churnick v. Fasig-Tipton, there were conditions of sale. Those conditions of sale said if there is an objection to the horse that you purchase, if you believe that there is a veterinary problem, then you must advise us, Fasig-Tipton, we will have three vets make a determination as to whether or not there was a deceptive act. The three vets, the disclosure was made, the three vets met and said, you lose, Mr. Beyer, because we've decided there's no deception. So under the concept of the conditions of sale are absolutely binding, the courts in Kentucky have held no, they're not, if there is a fraud that has been perpetrated. And in Fasig-Tipton, the- If you want to go into your rebuttal time, you can do that. Yes, sir. I think we should hear from Mr. Hurt. Yes, sir. Thank you. I may have pleased the court. I'm Bill Hurt. I'm here on behalf of Stevens Racing. As courts already recognize, this case begins and ends with the Keeneland conditions of sale. Keeneland conditions of sale is a comprehensive agreement. It's not an agreement that Mr. Stevens, Mr. Bizantz drafted. It's one that Keeneland drafted. Keeneland has no interest and does not favor buyers over sellers or sellers over buyers. Both are its customers, and its job is to try to come up with a uniform contract that reflects the industry, the practices in the industry, and what the industry expects. And that's what they've done. In this case, Keeneland has put the buyer beware language into the contract because it is the buyer that needs to make the decision as to whether to buy the horse. They're in a position to be able to do the investigation. In this case, they could have done their own radiographs, although at this point everybody admits that the radiographs would have shown exactly what the radiographs in the repository show. They could have done an ultrasound. It would have cost $195 to do the ultrasound. They didn't do that simply because of the cost. Well, do they have reason to think they had to do one? If there was any reason? According to Dr. Hay, no. But the other three vets that looked at the radiograph in the repository all agreed. They disagreed about what they saw. They all saw the same thing. They disagreed about how they classified it. One vet classified it as moderate to mild sesamoiditis, one sesamoiditis. The other said it's not quite sesamoiditis, but it's close. In any case, what they all agreed to is that they would have discussed ultrasound with their client if their client was the buyer. Every one of them said the same thing except Dr. Hay. Dr. Hay said he didn't say there was nothing there. What he said was there was nothing significant there. He didn't believe it was significant enough to qualify as sesamoiditis or to warrant any further investigation. If Dr. Hay was in some way negligent, for lack of a better term, is that negligence chargeable to Mr. Byzance under any of the fairly specialized law in this area? I don't think. I think under general law and the law of this case, he certainly would be. He's the agent of Mr. Byzance. Are there cases that say that in the source purchase context? I can't point the court today. I'd be glad to provide that. That's all right. I'm confident as a matter of general law that there's no question that the principal is bound by the agency's actions. I would say, though, in this context, the document itself deals with that situation. The document puts on the buyer the sole and exclusive obligation to do the presale investigation. It's their sole responsibility to determine the sufficiency and the extent of that investigation. That's the buyer's job. That's what their job is under the contract, and to the extent that they choose to not do certain things or they don't do a good job on certain things, it's clearly under the contract the conditions of sale. It's the buyer's responsibility. Unless you step as far out as the Solitary Oak case. There's no question that if there is, in that case, Solitary Oak, the buyer asks the seller a specific question. The seller knowingly lied in answering the question, which is a different case. As Judge Weir recognized, it's just simply not this case. Meaning that the due diligence would have included this buyer having to ask some questions if there was any issue, either of his or her own veterinarian or of the seller? Yes. I think that's an excellent question, and I think that's really the point of Solitary Oak. Solitary Oak, in my opinion, stands for the position that the buyer's investigation can take a lot of forms. They can do their own radiograph. They can watch the horse. They can have their vet look at the horse. They can do ultrasounds. Dr. Bramlage testified they could do lots of different things that cost money. But they can also ask questions. They can ask questions of the seller. They can ask questions of the seller's vet. They can ask questions of former owners. They can ask questions of a lot of different people. They can ask for the medical records. The seller may refuse to give them the medical records or may refuse to answer the questions, but then they know that they haven't gotten all the information they can make their decision. But the point is, Camelon puts the duty on the seller to do the investigation and to satisfy themselves that their investigation is sufficient and that they're going to live with whatever the consequences of that investigation are. It's their choice as to how much money to spend, a lot or a little. In this case, Mr. Bizantz did the minimum. The question isn't whether his investigation was reasonable. That's not the standard. The standard is it's his investigation to do and do whatever level that he thinks is appropriate, and then it's his results to look at. Does the record reflect whether Bizantz or Powell, wasn't it Powell that was his representative? No, there was Young and Hay. Hay was the veterinarian. Young was his representative. I'm sorry I said Powell. Does it reflect that they knew what the seller had paid for the horse when he acquired it? I don't recall, Your Honor. Your Honor, again, the case boils down to the conditions of sale. Conditions of sale are comprehensive. The thing that I think that Mr. Bizantz consistently misses is the pre-sale investigation. This isn't a contract that starts with actually buying the horse. It puts the investigation pre-sale on the buyer. There's a question about whether, for instance, some of the claims apply in a rescission-type situation, and the claim is that there was some kind of fraud in the inducement, but that's missing. They're putting the cart before the horse. The point is it's the buyer's responsibility to do that investigation before and make their own decision. They're not supposed to be relying under the clear language of the contract on what the seller's coming up with. And that applies no matter the remedy, whether you're seeking rescission, whether you're seeking damages. Sure. That precedent responsibility is what governs here in your estimation. The universe of this contract is buyer beware. I mean, that's the entire universe. There are a couple of little islands. That is the express warranties that are in the contract. There's only a couple of them. Or statements or express warranties outside the contract, correct? If there are express statements made outside the contract that are in fact actionable, and I can get to the statement, the one statement that was made, and it's clearly not actionable. It's clearly a prediction, an opinion about the sale price. Mr. Young testified that he understood the statement. I like her a lot to mean I think she's going to sell for a lot of money. She's going to bring a good sale price. That's it. It said nothing about the horse, just what he thought, what he predicted the sale price, about the sale price. The islands disappear, though, intentionally, by Keeneland. And the reason is that, one, that's what the market expects. Two, horses, the condition of a horse changes on a daily basis. Every single vet testified in this case that putting a horse on a trailer, the condition can change. So shipping from Kentucky to Florida, the condition can change. Training, putting a horse under track, under tack. All these things can change the condition of the horse, and frankly, just based on time. What we know in this case was that this horse trained for three months in Florida after the sale, had no problems. The vet that saw the horse while Mr. Stevens owned the horse was also the vet in Florida at the track, where at the training center where the horse was being trained, there were no problems. He talked to the trainer. The trainer said there are no problems. They continued training the horse in New York, shipped the horse to New York. And what we know is four months later, the horse sustained this injury in New York. It comes back to Kentucky, and Dr. Bramlage does a radiograph. The radiograph that he sees in August of 2013 shows what's called evulsive fractures. That's where pieces of the bone have actually pulled out. Little small fragments have actually pulled out. He compared that to the Keeneland sales, and it was clear it was a completely different injury. Clearly in the four months since the sale, the horse's condition had materially changed. There's no question about that. That is the recognition that Keeneland builds into the conditions of sale. Horses' conditions can change. Your argument is, though, that there was an underlying problem that, I guess, both allowed and caused the damage that occurred. That is the allegation. It is conjecture. The point is that they had the opportunity at the sale to do the ultrasound to determine whether or not there was a joint tendon problem. One thing that's important to recognize, and I think it's clear from Judge Weir's opinion, radiographs are x-rays. They image the bone. Ultrasounds image the soft tissue, the tendons, the ligaments, and so on like that. A tendon issue is not going to be shown on a radiograph. Vets, if they see a problem with a radiograph, they may know that it may be more likely that there's a tendon problem, and therefore know to look. In this case, as I said, three of the four vets agreed that, based on what they saw in the radiographs, they would have at least discussed doing an ultrasound with their client, the buyer. There are so many different things in this case. I know the time is getting short. I've got a lot of things I can go through, but if you've got any questions, I'd like to certainly address those otherwise. Why don't you distinguish Travis v. Washington Horse Breeders Association's statements from the statements in this case? Well, number one, the biggest distinction is that that is a Consumer Protection Act case under Washington law. I think, as I recall, the statements in that were that these are athletic horses, these are outstanding horses. At least that court believed that those statements directly related to the fitness of that horse to be able to perform whatever the buyer was buying them for. In this case, Mr. Young testified that his understanding of the one sole statement that Mr. Stevens made, I like this horse a lot, was simply a prediction, an opinion, about what he thought would be the sale price. So the character, at least in Kentucky, that is not an actionable statement. It's an opinion. It's not an actual statement under Kentucky's Uniform Commercial Code. It's clearly not a warranty. It can't be a warranty because it goes to the value of the good. I'm not an expert on Washington law, but that's certainly the distinction with respect to Kentucky law. All right. Thank you for your argument. Thank you, Your Honor. Tell us why you think Travis does apply. Your Honor, when a horse, as Mr. Hurd has said, is a living, breathing, active animal, as humans are, in that case where there is a horse that has all these moving parts, you don't know for sure what works, what doesn't, you have to rely on either what you can see, patent, if they're limping or they have a cut, or what you are disclosed, either by invasive mechanisms such as an X-ray or an ultrasound or by what you are told. If you are told that a horse is okay or I think she'll sell well, once you... Or here I really like her. Here I really like her. Here's what is the real problem here. If you go to Kentucky law, we have cited numerous cases that once you make a comment that is complimentary about a car or a horse or a piece of real estate or about an interest in real estate, once you make that comment, then you have an obligation to tell the rest of the story, Your Honor. I'm going to comment as vague and general and as obviously opinion and puffery as that one. Well, that opinion and puffery is exactly what was in the Republic Bank v. Beer Stearns case, Your Honor. It was... Okay, what was the statement there? Okay, the statement there was a collateral-backed security was reasonably safe. That's all they said. But that's a lot different than saying I like this horse. But if you look at it, Mr. Stevens used to work for Mr. Young. They were both horse trainers. They know that they talk to each other in their own kind of terms. Mr. Young said, I would have never, ever bought this horse had I known about the injury, the soft tissue injury. I agree with Mr. Hurt. That's exactly what the problem is. You can't see the injury to this soft tissue using an X-ray. That was all that was in the repository. I've looked back through my notes, Judge Strange, and what I believe Dr. Hayes said is on page 13 of his deposition. He said he did not have access to the radiology report. It was not an ultrasound report prepared by Dr. Chivanis, and he had not seen it prior to his deposition. It wasn't that I knew it was there and I chose not to look at it. Is there nowhere in that deposition that he says that he could have requested it but chose not to? If it was available. But he didn't say it was in there. Dr. Chivanis said it wasn't in there. I could have requested it, but I chose not to. I don't recall exactly what he said, but it wasn't in there. Dr. Chivanis said it wasn't in there. There's no evidence it was in there. Dr. Hayes looks at thousands of horses during the year. We have a material fraud issue here, Your Honor. The conditions of sale have promised Mr. Besantz there is no invasive joint surgery. There is no disease to the bone which impacts her ability to train and race. I'm telling you the truth about what drugs she's been given. All of those were violated. Mr. Besantz relied upon those as being true. So once he assumes all of that is true, and then Mr. Stevens says, I like her a lot, the combination. But there was no reason for him to do an ultrasound because where would you ultrasound? You've got the whole horse. They ultrasound any joint in the horse. So $195, if he had known where the injury was, that we believe Mr. Stevens fully knew. On three occasions, Dr. We understand your argument and time's up. Thank you. Thank you both for your arguments. Case to be submitted. Clerk may adjourn court.